635 So.2d 1305 (1994)
Carolyn B. BELL, Individually and on Behalf of the Minor Children, Todd G. Bell and Tyson A. Bell
v.
FARMER'S INSURANCE GROUP, et al.
No. 93-CA-2067.
Court of Appeal of Louisiana, Fourth Circuit.
April 14, 1994.
*1306 Russ M. Herman, Steven J. Lane, Brian A. Cadwallader, Herman, Herman, Katz & Cotlar, New Orleans, for appellants.
Terrill W. Boykin, McGlinchey, Stafford, Lang, New Orleans, for appellee.
Before LOBRANO, PLOTKIN and LANDRIEU, JJ.
LOBRANO, Judge.
This is the third time this case has been before us on summary judgment issues. In our most recent disposition we reversed a summary judgment in favor of Insurance Company of North America (INA) on a coverage issue. Bell v. Farmer's Ins. Group, 580 So.2d 547 (La.App. 4th Cir.1991), (referred to herein as Bell II). Subsequent to that decision, and armed with additional facts, INA filed three motions for summary judgment, all of which were granted by the trial court in a single judgment. The Bell family perfects this appeal.
The facts of this case are well summarized in Bell II, but for clarity and continuity purposes we repeat them here. The plaintiffs are the surviving wife and children of Robert Bell who was killed in an automobile accident in New Orleans on April 13, 1988. Dr. Bell was employed by the University of California at Berkley d/b/a Lawrence Livermore National Laboratory (LLNL). He and several co-employees attended a work-related *1307 conference in Vicksburg, Mississippi, April 11th through April 13th. Although most of the employees flew directly from California to Jackson, Mississippi, Dr. Bell and his colleague, Dr. Holley Dockery, with the consent and approval of their employer, flew to New Orleans. There, Dr. Bell rented an automobile from National Car Rental and he and Dr. Dockery drove to Vicksburg. At the conclusion of the conference, on April 13th, Drs. Bell and Dockery drove back to New Orleans where they were to spend the night and return to California on a flight the following afternoon. It was their intent to take in the sights of New Orleans before returning home.
When they reached New Orleans, apparently they got lost in the Gentilly area. At that time, Dr. Dockery was driving the rental car. At the corner of Chef Menteur Highway and Downman Road it is alleged she disregarded a traffic signal when entering the intersection. The rental vehicle was struck on its passenger side by Officer Henry Gueringer of the New Orleans Police Department. Dr. Bell was killed.
The Bell family filed the instant lawsuit for Dr. Bell's wrongful death. Among the many defendants named, INA was sued as the general liability and UM insurer of LLNL under both primary and excess policies. Specifically the Bells allege coverage by INA under its omnibus liability clause.
In Bell II, the issues before this Court were whether the facts sufficiently satisfied INA's policy definition of "Hired Automobile" and whether there was a valid rejection of UM coverage under both policies. We held that there were unresolved factual determinations necessitating trial on both issues. Bell v. Farmer's Ins. Group, supra.
The issues in the instant appeal arise from INA's three motions for summary judgment. In one motion INA reasserted its coverage argument that the vehicle driven by Dr. Dockery was not a "hired automobile" as defined by its policy. In another motion, INA argues that Drs. Bell and Dockery were in the course and scope of their employment at the time of the accident, and thus the Bell family is limited in its recovery to workmen's compensation, i.e. the co-employee immunity doctrine. Finally, in its third motion, INA argues that its excess policy does not provide coverage because it specifically excludes any loss arising out of work on the specific government contract which Drs. Bell and Dockery were assigned to.
The trial judge granted each of INA's motions. In a well written opinion, the court concluded that since LLNL, the named insured in INA's primary policy, did not lease the rental car and since "Bell had no authority to contract on behalf of his employer" the car Dr. Dockery was driving was not a "hired automobile" within the policy definition. The court further made the factual determination that Drs. Bell and Dockery were in the "course and scope" of their employment at the time of the accident and therefore the doctrine of co-employee immunity limited recovery by the Bells to worker's compensation. Finally the court concluded that "except for their involvement with contract 7405-ENG-8 they [Bell and Dockery] would not have travelled to New Orleans or to Vicksburg." Since INA's excess policy excludes all activities related to that government contract, the court rejected the Bells' claim of coverage under that policy.
The Bell family perfect this appeal asserting numerous arguments, including issues of material fact, the law of the case, failure of the trial court to consider motions in limine and various arguments of law concerning omnibus insurance coverages.
For the following reasons, we affirm that portion of the judgment which excludes excess coverage, reverse on the "hired automobile" and "course and scope" issue, reject UM coverage and remand for trial.
Initially we make the observation that this matter is before us on summary judgment. A summary judgment is one of the few instances where we, as an appellate court, review the case in the same manner as the trial court because there are no credibility or demeanor determinations. Galata v. Turner, *1308 602 So.2d 794 (La.App. 4th Cir.1992); South Central Bell Telephone Co. v. Rouse Co. of Louisiana, 590 So.2d 801 (La.App. 4th Cir. 1991). And, despite the plethora of depositions, affidavits and documents filed in this case, summary judgment is not a substitute for trial on the merits, nor is the court persuaded by who may appear to be eventually successful. Morgan v. Campbell, Campbell and Johnson, 561 So.2d 926 (La.App. 2nd Cir.1990). All doubts must be resolved against the moving party. Borne v. New Orleans Health Care, Inc., 580 So.2d 1070 (La.App. 4th Cir.1991), writ denied 586 So.2d 533 (La.1991).
With these principles in mind, we proceed to address the issues posed by INA's three motions and the trial court judgment.

PRIMARY COVERAGE:

A. "HIRED AUTOMOBILE"
The omnibus clause in INA's primary policy, in pertinent part, provides, coverage to:
"D. Any person or entity using ... a hired automobile ... provided the actual use of the automobile is by and with the permission of the Named Insured."[1]
The policy defines a "hired automobile" as:
"An automobile used under contract in behalf of or loaned to, the Named Insured, provided such automobile is not owned by or registered in the name of:
A. The Named Insured.
B. An officer, servant or employee of the Named Insured who is granted an operating allowance of any sort for the use of such automobile."
INA argues that since the named insured in its primary policy is LLNL and because LLNL did not lease the vehicle driven by Dr. Dockery there is no omnibus coverage. The trial court accepted that argument.
To factually support its position INA refers to National's rental receipt which shows Dr. Bell as the lessee, and the affidavit of Robert F. Perret, LLNL Division leader, who stated that Dr. Bell had no authority to contract for the University. To legally support its argument, INA cites Sampay v. Morton Salt Co., 482 So.2d 752 (La.App. 1st Cir.1985) and Juan v. Harris, 279 So.2d 187 (La.1973).[2]
In Sampay v. Morton Salt, the policy definition, in pertinent part, provided that a "hired automobile" was "... an automobile... which is used under contract in behalf of... the named insured...." The key phrase, "used under contract in behalf of," was interpreted to mean that there must be a separate contract by which the vehicle is hired or leased to the named insured for his exclusive use and control. The court cited Sprow v. Hartford Insurance Co., 594 F.2d 418 (5th Cir.1979) and Russom v. Insurance Company of North America, 421 F.2d 985 (6th Cir.1970) in support of its interpretation.
While we do not disagree with the interpretation in either the Sampay case or the cited Federal cases as it applies to their particular facts, INA's reliance on the language of those cases is not entirely supportive of its position. In particular, in each of those cases there was no separate rental agreement of any kind. The courts' holdings were predicated on that fact, and thus their conclusions that the vehicles could not be "hired automobiles" are correct. The key to the rulings was the absence of a separate contract. For example, in Sampay, the vehicle in question was a tractor-trailer hauling salt for the insured. The vehicle was owned by a company in the business of hauling freight. The insured did not rent the specific vehicle for its exclusive use. It merely contracted with the freight company to deliver the salt. Similarly, in Sprow v. Hartford, supra, the argument was made that a joint venture agreement should be interpreted as a "rental contract" of a truck used by the joint venture. The court relied on the absence *1309 of any separate rental contract in holding that there was no "hired automobile" within the policy definition. However, in Russom v. Insurance Company of North America, supra, the court did find that a separate contract existed for the leasing of the vehicle in question, and thus the vehicle became a "hired automobile." The court further concluded that it was immaterial whether the named insured had in fact exercised any control over that vehicle.
In addition, we are not persuaded by the California case of Continental Casualty Co. v. Hartford Accident and Indemnity Co., 213 Cal.App.2d 78, 28 Cal.Rptr. 606 (1st Dist. 1963) cited by INA. Ironically, the policy in that case excluded coverage for hazards associated with the use of a "hired automobile." There, the insured's employee rented a vehicle in his own name. It was stipulated that the employee was within the course and scope of his employment at the time of the accident. However there was no stipulation that the rental contract was "in behalf of the insured." The court held that the vehicle was not a hired automobile and thus the exclusion was not applicable. The court relied on the general principle of insurance interpretation that an insuring agreement will be given such construction as will fairly achieve coverage for the losses insured against. Factually, the court reasoned that there was no basis to conclude that when the employee rented the car "he was acting for or with the consent of [his employer]." Id. at 90, 28 Cal.Rptr. 606.
The instant case is different. First, there exists a separate rental contract for the vehicle Dockery was driving. Second, the issue of whether the rental car was "used under contract in behalf of ... the Named Insured" must be resolved in its most inclusive, and not exclusive, sense. Factually, we know that Dr. Bell is the party who actually rented the vehicle. We also know that Dr. Bell and Dr. Dockery were on an employment-related trip and their expenses, including the car rental, were to be reimbursed by LLNL. We note from the National Rental receipt there is the notation "RES," (presumably meaning reservation) followed by a series of numbers, then the words "Department of Energy" followed by other numbers. This notation supports the fact that the reservations were made by or through LLNL and obviously refers to the government contract on which Bell was working. This is consistent with the deposition of William Hartman.[3] It is also an established fact that Bell and Dockery's route to Vicksburg via New Orleans was approved by LLNL and, actually resulted in a cost benefit to their employer. There is no evidence to suggest, however, that they were ordered to rent a car in New Orleans.
Initially, and as a matter of law, we hold that the definitional phrase "used under contract in behalf of ... the Named Insured" does not mean only those vehicles actually leased to the insured in its name. That would be a very restrictive interpretation and is not what the phrase says. We find no merit to INA's argument that Section IV(D)(2) supports the restrictive interpretation it espouses. Section IV(D)(2) excludes omnibus coverage "[w]ith respect to any hired automobile, to the owner, or a lessee thereof, other than the Named Insured...." Clearly, omnibus coverage is not provided to the owner of a hired automobile, i.e. in this case, National Car Rental. In addition, the qualifying phrase "other than the Named Insured," which appears after the word "lessee" does not support the proposition that the Named Insured be the actual lessee of the vehicle for it to be a "hired vehicle." If, in order to qualify as a "hired automobile" the named insured must be the actual lessee, as INA argues, then why exclude the lessee of a hired automobile since there would be no "hired automobile" in the first instance without LLNL being the actual lessee. If it was INA's intent to provide omnibus coverage only to those who operated vehicles actually leased by LLNL, it could have easily stated so in its definition of "hired automobiles."
We find that there are sufficient undisputed facts to determine that the vehicle leased *1310 by Bell and driven by Dockery satisfies the definition of a "Hired Automobile." Even though the vehicle was leased in Bell's name, it is undisputed that LLNL paid for his transportation to Vicksburg. His travel via New Orleans was approved by his employer. It is also undisputed that the purpose of Bell's trip was to attend an employment related conference. Although Bell could not contract on behalf of LLNL, the vehicle was used by him with its knowledge and consent to reach the conference location. Under these particular facts, we conclude that the rented vehicle was used under contract in behalf of LLNL, and thus meets the policy definition of a "Hired Automobile."

B. "COURSE AND SCOPE"

INA makes the argument that at the time of the accident both Bell and Dockery were in the "course and scope" of their employment and thus the doctrine of co-employee immunity limits Bell's recovery to worker's compensation. The Bell family argues that the work phase of the Vicksburg trip had ceased when the seminar concluded, and that the New Orleans portion of the trip was purely personal, involved sightseeing and socializing, which are clearly not work related. Both parties cite Renfroe v. City of New Orleans, 394 So.2d 787 (La.App. 4th Cir. 1981), writ denied 399 So.2d 621 (La.1981).[4]
Renfroe provides the generally accepted legal guidelines to be utilized in determining whether an accident occurred during the "course and scope" of employment. Without reiterating each inquiry set forth in Renfroe suffice it to say that resolution of the issue is entirely fact sensitive. It requires a determination of numerous facts, many of which are still at issue in this case. We find it unnecessary to review each and every factual conclusion still at issue.[5] We are satisfied that, applying the summary judgment standard of review previously noted, a trial on the merits is required to resolve this issue. The issue of when "work" stopped and "personal activities" began is purely factual and is an improper subject of summary judgment in this case.

EXCESS COVERAGE
The trial court denied excess coverage based on exclusion 2L of INA's excess policy. That exclusion provides that the policy does not apply to:
"L. Loss or damage arising out of programs conducted in accordance with the following contracts between the Regents of the University of California and the U.S. Department of Energy.
Contract # W-7405-ENG-48-Lawrence Livermore National Laboratory."
The trial court reasoned that "except for their involvement with contract 7405-ENG-48 they (Bell and Dockery) would not have travelled to New Orleans or to Vicksburg." Although the Bell family argues that this is really a "course and scope" exclusion which should be decided on the merits, we disagree. It is undisputed that had it not been for the program, Bell and Dockery would not have travelled to Vicksburg. Whether they went through New Orleans or not is irrelevant with regards to this issue. It is further undisputed that the Vicksburg program was conducted in accordance with contract 7405-ENG-48. In our opinion, the intent of exclusion 2L could not be clearer. Any loss connected with or related to the described contract is excluded.

UM COVERAGE:
Because we hold there is no coverage under INA's excess policy, it is unnecessary to address Bell's UM arguments with respect to that policy. However, because the "course *1311 and scope" issue will determine only liability coverage under the primary policy, we address the UM question under that policy.
INA's policy was issued October 1, 1983. Endorsement No. 3 to that policy specifically rejects UM coverage in accordance with California law. Bell argues, however, that Louisiana law is applicable, and that there is a material issue of fact as to whether the policy is a renewal or "new" policy requiring another UM rejection. In support, Bell refers to La. R.S. 22:1406(D)(1)(a)(iii) which provides: "This Subparagraph and its requirement for uninsured motorist coverage shall apply to any liability insurance covering any accident which occurs in this state and involves a resident of this state." We disagree.
Act 444 of 1987 [La.R.S. 22:1406(D)(1)(a)(iii)] became effective September 1, 1987. Prior to its adoption, Louisiana's compulsory uninsured motorist law applied only to automobile policies "delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state...." Snider v. Murray, 461 So.2d 1051 (La.1985), at 1053, quoting Abel v. White, 430 So.2d 202 (La.App. 4th Cir.1983). In reaction to Snider, supra, the legislature adopted Act 444 which imposed Louisiana's UM obligations on any liability insurance covering any accident in this state which involves a Louisiana resident. Obviously, in the instant case, the accident occurred here and involved a Louisiana resident (Officer Gueringer). Application of Act 444 would require us to consider the validity of INA's UM rejection in accordance with Louisiana law. However, we decide that Act 444 of 1987 is not applicable.
As we previously noted, INA's policy was issued in California to a California resident on October 1, 1983. It is a general liability policy and covers no specific vehicles. At the time it was issued, Louisiana's uninsured motorist statute would not have been applicable. The effect of Act 444 of 1987 was to bring insurance policies under the umbrella of Louisiana's UM laws where they previously were not included. We hold that it is a substantive law and cannot be retroactively applied to a policy issued prior to its effective date. To hold otherwise would result in Louisiana legislatively imposing additional obligations on an existing insurance contract executed and delivered in California. This would violate the constitutional prohibition of ex-post facto laws.[6] We hold that California's UM law is applicable.
California Insurance Code Section 11580.2 provides substantially similar provisions as Louisiana's law. Rejection of UM coverage requires a special form which is delineated in the statute. INA's policy (endorsement 3) meets that requirement. One noteworthy difference in California's law is that a UM rejection shall continue to be binding with respect to any continuation or renewal of the policy or "with respect to any other policy which extends, changes, supercedes, or replaces the policy issued to the named insured...." Cal. Insurance Code Section 11580.2(a)(1). Thus under California law it is immaterial whether INA's policy is a renewal or "new" policy as Bell argues. The valid initial UM rejection continues to be binding. We therefore hold that INA's primary policy affords no uninsured motorist coverage.
Accordingly, for the reasons assigned, we reverse that portion of the trial court's judgment which excludes coverage based on the definition of "Hired Automobiles" in INA's primary policy, and hold that the vehicle is a "Hired Automobile;" we reverse and remand for trial on the merits that portion of the trial court's judgment concerning "course and scope of employment;" we affirm the denial of excess coverage and rejection of UM coverage.
REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART; AFFIRMED IN PART.
LANDRIEU, J., concurs with reasons.
*1312 LANDRIEU, Judge, concurs with reasons.
I concur with the majority in affirming those parts of the trial court judgment which exclude excess coverage and UM coverage.
I also concur with the majority in reversing those parts of the trial court judgment which hold the automobile not to be a "hired automobile" and which hold that Drs. Bell and Dockery were in the "course and scope" of their employment.
To the extent that the majority suggest that omnibus coverage exists because we hold that the automobile is a "hired automobile", I dissent. That is not the end of the inquiry. While Section IV(D)(2) does not exclude Dr. Dockery from coverage, she could be excluded if she is found to have been a co-lessee with Dr. Bell or an agent of Dr. Bell.
The interpretation of the majority of the term "lessee" in Section IV(D)(2) to mean one who leases an automobile from the Named Insured is strained. Dr. Bell was surely a lessee within the meaning of that word and, thereby, excluded from coverage under the omnibus clause. He was covered, however, as an employee of the Named Insured while acting within the scope of his employment.
If Dr. Dockery was not a co-lessee with Dr. Bell or was not acting as his agent, she is covered under the omnibus clause provided she was operating the hired automobile with permission of the Named Insured given through Dr. Bell.
NOTES
[1] Section IV(D) of the policy.
[2] Juan v. Harris did not require interpretation of the "Hired Automobile" definition. That case involved the issue of conflicting policies and which would be primary and which would be excess.
[3] Hartman was the travel policy director at LLNL.
[4] Numerous other cases are cited by each party supporting various individual conclusions about course and scope. Each case, however, is entirely dependent on factual findings.
[5] For example, there is dispute regarding whether LLNL,s cost benefit in routing Bell and Dockery through New Orleans was pertinent to the decision to travel via New Orleans. Hartman's deposition indicates there was no official necessity to go to New Orleans, yet Bell and Dockery's travel plans through New Orleans were officially sanctioned and approved by LLNL.
[6] "No bill of attainer, ex-post facto law or law impairing the obligations of contract shall be enacted." La. Const. Art. 1, Sec. 23.